UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 4:14-CV-40182 TSH

| | |
|---|---|
| WILLIAM GEOFFROY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| TOWN OF WINCHENDON, | ) |
| SCOTT LIVINGSTON, as Chief of Police | ) |
| JAMES KREIDLER, as Town Manager | ) |
| DAVID WALSH, as Chief of Police | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' TOWN OF WINCHENDON, SCOTT LIVINGSTON, JAMES KREIDLER, AND DAVID WALSH
MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

The Defendants Town of Winchendon, Scott Livingston, James Kreidler, and David Walsh ("Defendants") hereby move for summary judgment pursuant to Fed. R. Civ. P. Rule 56 and request that the Court grant summary judgment in their favor on all counts of the Plaintiffs' Amended Complaint alleged against these Defendants. As grounds, Defendants state that there are no genuine issues of material fact. Therefore, summary judgment for the Defendants is appropriate as a matter of law.

**FACTUAL BACKGROUND**

William Geoffroy ("Geoffroy") became a police officer in the Town of Winchendon in 1985. <u>See</u> attached Statement of Undisputed Facts ("SUF") ¶ 1. In October of 2011 Geoffroy was employed as a Sergeant on the Winchendon Police Department. <u>See</u> SUF ¶ 2. Geoffroy was involved in a dating relationship with a female named Catherine Phongsaly ("Phongsaly") for a few weeks between June and July of 2011. <u>See</u> SUF ¶ 3.

1

On the night of October 7, 2011 Geoffroy consumed approximately two and a half beers at the Lucky Dragon restaurant in Winchendon.  See SUF ¶ 4.  At approximately 1:30 a.m. on October 8, 2011, Geoffroy drove unannounced to Phongsaly's home to see her.  See SUF ¶ 5.  Upon arriving at Phongsaly's residence, Geoffroy observed that a Silver Toyota belonging to a male friend of Phongsaly's was parked in her driveway.  See SUF ¶ 6.  After returning home at around 2 a.m. on October 8, 2011 Geoffroy phoned Phongsaly and left a voicemail message on her phone.  See SUF ¶ 7.  Additionally, Geoffroy sent Phongsaly approximately 28 lengthy text messages.  See SUF ¶ 8.

The following day, Phongsaly made contact with another Winchendon officer Sergeant Gagne ("Gagne"), who had stopped at the donut shop where she was employed, and relayed the voicemail and the details of the incident to him.  See SUF ¶ 9.  Gagne then contacted Lieutenant Walsh and made him aware of the voicemail.  See SUF ¶ 10.  Lieutenant Walsh then contacted Chief Livingston to make him aware of the information that Gagne had relayed to him.  See SUF ¶ 11.  At this point, Chief Livingston instructed Lieutenant Walsh to open an investigation into the incident.  See SUF ¶ 12.

After hearing the contents of the voicemail message, which consisted of a "two- or three-minute tirade," Chief Livingston was "shocked" and "disgusted."  See SUF ¶ 13.  The voicemail used profane language, including the word "f***" 26 times.  See SUF ¶ 14.  Geoffroy told Phongsaly in the message that she was "lucky [he] didn't kick [her] f***ing door in."  See SUF ¶ 14.

Phongsaly came to the police station and gave a statement where she stated that she was "concerned" saying, "if he could do this after a few beers, what could he do when he

2

was drunk?" See SUF ¶ 15. Sergeant Raymond Anair spoke with Phongsaly, who expressed her concern about Geoffroy, and said that he had previously told her "it wasn't hard to keep an eye on [her]… without [her] even knowing." See SUF ¶ 16. Sergeant Anair discussed Phongsaly's option to pursue a 209A restraining order with her. See SUF ¶ 16.

Lieutenant Walsh took a statement from Phongsaly in which she stated that Geoffroy was "way too jealous," "would get really mad," "would get all mean," "became obsessive," and told her "he was really good at watching [her]." See SUF ¶ 17. Phongsaly also stated that Geoffroy "went bananas" when she tried to break up with him, "driving by [her] house at all times of the night," "coming into [her] work frequently," and "run[ning] plates of vehicles parked outside [her] apartment." See SUF ¶ 18. Her "friends and coworkers started calling him the 'stalker.'" See SUF ¶ 18. Phongsaly said that there was no physical abuse in the relationship, but that she had heard Geoffroy had abused girlfriends and his ex-wife in the past. See SUF ¶ 19.

Both Walsh and Kreidler believed that Geoffroy's actions constituted criminal activity, namely stalking and harassment. See SUF ¶ 20. Walsh also believed that Geoffroy's conduct, including threatening to kick someone's door down, running license plates, following Phongsaly, and other actions, were a violation of department policy as Conduct Unbecoming. See SUF ¶ 20. The Winchendon Police Department practices a "zero tolerance policy" regarding domestic violence, including stalking and threats. See SUF ¶ 21.

An initial meeting was held where Chief Livingston reviewed the tape with Geoffroy and his union representative. See SUF ¶ 22. Geoffroy was given an opportunity to speak

and chose not to. See SUF ¶ 22. During this initial meeting the possibility of discipline, which included suspension and demotion, was discussed with Geoffroy. See SUF ¶ 23. Chief Livingston also suspended Geoffroy's firearm license after Geoffroy's union president Martin Rose ("Rose") expressed concern that he believed Geoffroy might try to hurt himself. See SUF ¶ 24.

On October 19, 2011, during a meeting held at the Town Manager's office, Geoffroy, accompanied by union representatives and union counsel, was offered either termination or resignation and chose to resign. See SUF ¶ 25. Prior to deciding if he wished to resign, Geoffroy spoke to Rose. See SUF ¶ 26. Rose advised Geoffroy that his best option was to resign, but that in the end it was his decision to make. See SUF ¶ 26.

Geoffroy also spoke to union representative Mike Bombard ("Bombard"). See SUF ¶ 27. Bombard did not force Geoffroy to resign and advised Geoffroy that ultimately the decision was his to make. See SUF ¶ 27. Bombard attempted to convince Geoffroy not to resign, but Geoffroy insisted on resignation. See SUF ¶ 27.

Geoffroy further consulted with the union attorney, Michael Clancy ("Clancy"). See SUF ¶ 28. Clancy did not force Geoffroy to resign or encourage him to sign the agreement. See SUF ¶ 28. Prior to Geoffroy's resignation, Geoffroy met with Attorney Clancy, who advised him of his rights and went through the resignation agreement, section by section, before allowing him to make a decision on how to proceed. See SUF ¶ 28. Geoffroy made the decision to resign rather than face a termination hearing in order to save his pension. See SUF ¶ 29. Geoffroy acknowledges that he had a choice of whether to resign or be terminated. See SUF ¶ 29.

4

On October 24, 2011 Geoffroy returned to the Town Manager's office accompanied by Derek Blair ("Blair"), the vice president of the union, and signed a release agreement relative to his resignation.  See SUF ¶ 30.  Blair did not force Geoffroy to resign.  See SUF ¶ 30.  Geoffroy signed the agreement of his own free will, allowing him to continue to receive payroll for approximately six months until his anniversary date and retain his pension.  See SUF ¶ 31.

Geoffroy had 21 days to review the agreement and seven days to revoke after signing.  See SUF ¶ 32.  Geoffroy was familiar with the disciplinary system of the department and the town, having been through the disciplinary process before, negotiated suspensions, including obtaining immunity for himself in one incident, and signed a 2002 release agreement with the town regarding a suspension.  See SUF ¶ 32.  Geoffroy had also been an active union member for 27 years and previously served as secretary in the police union.  See SUF ¶ 32.

Geoffroy also sent a letter of resignation "for the sole purpose of retirement" to Kreidler, which Kreidler accepted.  See SUF ¶ 33.  The Agreement Geoffroy signed with the town promises only a neutral reference, not the issuing of a retirement identification.  See SUF ¶ 34.

In September or October of 2012 Geoffroy requested a police retirement identification and his request was rejected.  See SUF ¶ 35.  Chief Livingston cites a lack of "good standing" as the reason why Geoffroy was not issued a retirement identification.  See SUF ¶ 35.  The Massachusetts ID policy put out by the Massachusetts Chiefs of Police Association state that an officer needs to be in good standing at the time of retirement in order to receive a retirement identification.  See SUF ¶ 36.  It was the

opinion of both Livingston and Walsh that Geoffroy was not in good standing at the time he left the department. See SUF ¶ 36. Geoffroy filed a charge with Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC"), alleging retaliation for not receiving his retirement identification. See SUF ¶ 37.

Ruth DeAmicis ("DeAmicis"), an editor for *The Winchendon Courier*, wrote a paragraph for the newspaper stating that, "Geoffroy was forced to resign in 2012; amid a scenario involving a breakup with a girlfriend that seemed to affect his job performance at that time." See SUF ¶ 38. DeAmicis obtained this information from "executive session minutes from the selectmen." See SUF ¶ 39. DeAmicis never discussed this article with anyone from the police department or anyone else from the town, other than the Board of Selectmen. See SUF ¶ 39.

The executive session minutes from October 24, 2011, reflect that Kreidler updated the Board on Geoffroy's situation in his official capacity as Town Manager. See SUF ¶ 40. The minutes state, in relevant part, that Geoffroy "was involved in a consensual relationship with someone much younger… His reported behavior, not wanting this breakup, was not fitting for his position." See SUF ¶ 40.

## ARGUMENT

### I. Standard of Review

Summary judgment is appropriate in this case because there are no genuine issues of material fact for trial. See Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the Court must "view the record in the light most favorable to the nonmoving party, and… draw all reasonable inferences in the nonmoving party's favor." LeBlanc v.

Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  The moving party must demonstrate "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

> II.  **Counts I and II of age discrimination under M.G.L. c. 151B, § 4(1B) and the Age Discrimination in Employment Act ("ADEA") fail as a matter of law because, by voluntarily resigning, Plaintiff experienced no adverse employment action.**

Plaintiff alleges age discrimination under both state statute, M.G.L. c. 151B, § 4(1B), and federal law, 29 U.S.C. § 623, the Age Discrimination in Employment Act ("ADEA").  The two laws are "substantially identical." Mullin v. Raytheon Co., 164 F.3d 696, 705 (1st Cir. 1999).

In an age discrimination case, the plaintiff bears the burden of showing that "he would not have been fired but for his age." Freeman v. Package Machinery Co., 865 F.2d 1331, 1335 (1st Cir. 1988).  To establish a *prima facie* case of age discrimination, the plaintiff must show that he: "(1) was at least forty years of age, (2) met the employer's legitimate job performance expectations, (3) experienced adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifications." Goldman v. First Nat'l Bank, 985 F.2d 1113, 1117 (1st Cir. 1993).

Here, Plaintiff is over forty years old.  He has not, however, met his burden on any other element.  Plaintiff did not meet employer's legitimate job performance expectations, specifically the police department's "zero tolerance policy" regarding

7

domestic violence, including stalking and threats.  See Exhibit 10, "Domestic Violence by Police Officers."

Nor has Plaintiff experienced an adverse employment action.  Plaintiff chose to resign in order to retain his pension rather than be terminated for cause; he cannot now claim this constituted an adverse employment action.  When an employee is "confronted with the option of resigning or being fired 'for cause,'" that employee "has not been 'forced' to resign."  Pierce v. Alice Peck Day Mem. Hosp., No. 00-318-M, 2002 U.S. Dist. LEXIS 5516, at *13 n.2 (D.N.H. Mar. 11, 2002).  "Resignations are generally presumed to be voluntary" and here, Plaintiff made a voluntary and informed decision to resign.  See Id.  Plaintiff consulted with a number of parties, including union president Rose, union representative Bombard, union attorney Clancy, and union vice-president Blair, all of whom stated that Plaintiff voluntarily chose to resign.  See Exhibit 4, Rose Deposition p. 23, lines 3-12; Exhibit 5, Bombard Deposition p. 18-19; p. 36, lines 14-16; Exhibit 6, Clancy Deposition p. 28, lines 13-15; p. 56, lines 14-18.  Plaintiff also went through the agreement carefully with his union attorney before choosing to sign it, demonstrating that he fully understood what he was signing and chose to do so.  See Exhibit 6, Clancy Deposition p. 30, lines 8-16; p. 61, lines 7-22.

The plaintiff also had 21 days to review the agreement and seven days to revoke after signing, which he did not take advantage of.  See Exhibit 11, Separation Agreement and General Release ("Agreement").  See Christie v. United States, 207 Ct. Cl. 333, 338-40 (Court of Claims 1975) (noting that, because plaintiff had a choice to resign or "stand pat and fight" a possible termination, her resignation was not coerced).

Additionally, Defendants could legitimately have fired Plaintiff for cause, namely his violation of the department's domestic violence policy or for conduct unbecoming an officer. See Marshall v. Golfview Dev. Ctr., No. 99C7384, 2001 U.S. Dist. LEXIS 7736, at *21-22 (N.D. Ill. Jun. 5, 2001) (finding that resignations in the face of termination are voluntary unless a plaintiff can "demonstrate that Defendant believed that the basis for discharge was unfounded to establish duress or coercion"). Accordingly, Plaintiff cannot overcome the presumption that his resignation was voluntary and thus he has experienced no adverse employment action.

Although Plaintiff has failed to establish his *prima facie* case here, even if he had, Defendants would still prevail on this claim under the burden-shifting framework. If plaintiff establishes the *prima facie* case, it creates a rebuttable presumption that employer "engaged in impermissible age discrimination." LeBlanc, 6 F.3d at 842. The employer then must "articulate a legitimate, non-discriminatory reason for employee's termination." Lawrence v. Northrop Corp., 980 F.2d 66, 69 (1st Cir. 1992). This burden is only one of production; "the burden of persuasion remains plaintiff's at all times." Id. And once the employer puts forth a nondiscriminatory reason, the presumption disappears and the burden shifts back to the plaintiff to show that the reason provided was "a mere pretext for unlawful age discrimination." LeBlanc, 6 F.3d at 842.

Plaintiff cannot meet his burden of showing that Defendants' legitimate, nondiscriminatory reason for offering him the opportunity to resign was a pretext for age discrimination and thus has failed to "make a sufficient showing that discriminatory animus motivated the action." See Goldman, 985 F.2d at 1117. The focus of this inquiry is whether "the employer believed its stated reason to be credible." Mesnick v. General

9

Electric Co., 950 F.2d 816, 824 (1st Cir. 1991). Defendants certainly believed that Plaintiff's behavior in his relationship, including signs of stalking and harassment, was a credible reason to ask Plaintiff to resign or risk termination. Both Walsh and Kreidler believed that Plaintiff's actions constituted criminal activity and a serious violation of department policy. See Exhibit 2, Walsh Deposition p. 56-59; Exhibit 9, Kreidler Deposition p. 127-28. Plaintiff offers no evidence that Defendants treated him differently on the basis of age prior to this incident, that Plaintiff could have retained his job following the incident were it not for his age, or that anyone in the department possessed or demonstrated age-related animus towards him. Where, as here, "the record is devoid of direct and circumstantial evidence of discriminatory animus", Plaintiff "cannot avert summary judgment." Goldman, 985 F.2d at 1118.

Therefore, because Plaintiff did not experience an adverse employment action, this Court should enter summary judgment for Defendants on his discrimination claims.

**III.    Count III of unlawful retaliation under M.G.L. c. 151B, § 4(4) fails as a matter of law because Defendants had a legitimate and non-retaliatory reason for refusing to issue Plaintiff his retirement identification, and because loss of this retirement identification does not constitute an adverse employment action.**

Plaintiff alleges that Defendants unlawfully retaliated against him by refusing to issue him a retirement identification card and by "allowing fellow officers…to violate the Agreement." See Complaint (Document 23). Establishing a retaliation claim requires a showing that plaintiff engaged in protected conduct, experienced an adverse employment action, and there was a "causal connection between the protected conduct and the adverse employment action." Calero-Cerezo v. United States DOJ, 355 F.3d 6, 25 (1st Cir. 2004). If plaintiff makes this *prima facie* showing, the employer "must articulate a

legitimate, non-retaliatory reason for its employment decision." Id. at 26. Once the employer articulates, but not necessarily proves, a legitimate reason, the burden shifts back to the plaintiff to "elucidate specific facts" showing that this legitimate reason was a pretext "intended to cover up the employer's real motive." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990).

Plaintiff engaged in protected conduct with the initial filing of his discrimination claim. He has not, however, experienced an adverse employment action causally connected to this activity, and Defendants' legitimate reason for denying his retirement identification does not conceal a discriminatory or retaliatory pretext.

Although there is some support for the notion that post-termination or resignation actions can constitute an adverse employment action, see Ngassa v. Ocean State Job Lot Stores of Se MA, Inc., No. 09-2138, 2010 Mass. Super. LEXIS 32 (Mass. Super. Ct. Feb. 3, 2010), Plaintiff's case here differs materially from those rare examples. Denying the issuing of a retirement identification is not "substantial enough to have materially disadvantaged an employee" and thus is not an adverse employment action. See Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 530 (Mass. 2011) (vacating summary judgment for defendants because employers' filing of a lawsuit against the plaintiff, who was no longer an employee, could potentially constitute a material disadvantage).

Nor is Plaintiff's filing of a discrimination charge causally connected to Defendants' refusal to issue a retirement identification. It was Plaintiff's deficiency as an employee, not his filing of a charge, that led to this action. Compare Mole v. Univ. of Mass., 814 N.E.2d 329, 339 (Mass. 2004) (inferring causation is possible when "adverse action is taken against a satisfactorily performing employee"), with Iorio v. Aramark

Servicemaster, No. 03-40147, 2005 U.S. Dist. LEXIS 40290, at *70-71 (D. Mass. Sep. 30, 2005) (finding no causal connection between protected action and termination where employee had a history of performance issues because employer should not be "required to retain [plaintiff], customer's dissatisfaction notwithstanding, simply because she engaged in conduct protected under Chapter 151B").

Defendants have a legitimate, non-retaliatory reason for refusing issuance of Plaintiff's retirement identification, his lack of good standing when leaving the department. See Exhibit 3, Livingston Deposition, p. 34, lines 2-5; Exhibit 2, Walsh Deposition, p. 34-35; Exhibit 17, Livingston's Answers to Interrogatories. The Massachusetts Police Chiefs Association has a good standing requirement in order to receive a retirement identification. See Exhibit 17, Livingston's Answers to Interrogatories. Although Plaintiff claims that he was scheduled to receive his retirement identification on April 27, 2012, the Agreement he signed with the town promises only a neutral reference, not the issuing of a retirement identification. See Exhibit 12, MCAD/EEOC Charge; Exhibit 11, Agreement. Plaintiff has not elucidated specific facts that show this reason was pretext and accordingly, his retaliation claim fails as a matter of law.

Because Defendants had a legitimate and non-retaliatory reason for refusing to issue Plaintiff his retirement identification, and because loss of this retirement identification does not constitute an adverse employment action, this Court should enter summary judgment for Defendants on the retaliation claim.

**IV.    Count IV under the Older Workers Benefit Protection Act ("OWBPA") fails as a matter of law because it is not separately actionable and because Plaintiff's waiver of his right to sue was knowing and voluntary.**

Plaintiff contends that Defendants violated the Older Workers Benefit Protection Act ("OWBPA") by forcing him to sign the resignation agreement. OWBPA "impose[s] specific duties on employers who seek releases of certain claims created by statute," meaning that an "employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." Oubre v. Entergy Operations, 522 U.S. 422, 426-27 (1998).  Waiver of any right or claim must be "knowing and voluntary."  29 U.S.C.S. § 626(f)(1).  The OWBPA does not, however, provide "a separate cause of action for damages." Maher v. GSI Lumonics, Inc., No. 03-10187, 2004 U.S. Dist. LEXIS 29063, at *6-7 (D. Mass. Apr. 9, 2004).

Plaintiff claims the agreement he signed was deficient under the OWBPA because he felt "he had no choice other than to sign the Agreement" and he was not given 21 days to consider the agreement.  See Complaint (Document 23), ¶¶ 82-84 (Document 1, Exhibit A).  All parties involved stated, however, that Plaintiff voluntarily decided to resign.  See Exhibit 4, Rose Deposition p. 23, lines 3-12; Exhibit 5, Bombard Deposition p. 18-19; p. 36, lines 14-16; Exhibit 6, Clancy Deposition p. 28, lines 13-15; p. 56, lines 14-18.  The Agreement explicitly states that "[e]mployee… may have twenty-one (21) days in which to review this Agreement prior to signing it." See Exhibit 11, Agreement, ¶ 12(a).  It also provided Plaintiff with a seven-day period in which to revoke the agreement.  See Exhibit 11, Agreement, ¶ 12(b).  Plaintiff did not choose to exercise either of these options.

Additionally, the agreement conforms with the other minimum requirements of the OWBPA, including that it "specifically refers to rights or claims arising out of the act," "is written in a manner calculated to be understood by such individual," and that Plaintiff

had the opportunity "to consult with an attorney." See 29 U.S.C.S. § 626(f); see Exhibit 11, Agreement.  Plaintiff reviewed the resignation agreement "paragraph by paragraph" with his union attorney, Mike Clancy, before signing it.  See Exhibit 6, Clancy Deposition p. 30, lines 8-16; p. 61, lines 7-22.  Plaintiff also was familiar with the disciplinary procedures in the town and the department, showing enough knowledge of the system to negotiate immunity and request a hearing in prior disciplinary proceedings.  See Exhibit 1, Plaintiff's Deposition p. 224, lines 3-11; p. 231, lines 4-24; p. 234, lines 7-17; Exhibit 23, Settlement Agreement and Release; Exhibit 24, Hearing Request letter; Exhibit 25, Order to Respond letter and response.  This, along with his experience as a union member and officer, further evinces that Plaintiff made a knowing and voluntary decision to sign the Agreement.

Because the OWBPA does not provide a separate cause of action, this Court should enter summary judgment for Defendants on Plaintiff's defamation claim.  Additionally, because Plaintiff's knowing and voluntary waiver was valid, this Court should enter summary judgment for Defendants on Plaintiff's discrimination claims on the grounds that he waived his right to sue.

### V. Count V of defamation fails as a matter of law because Defendants are entitled to conditional privilege.

Plaintiff contends that Defendants defamed him by communicating false information about him.  To survive summary judgment on a defamation claim, plaintiff must show that "the defendant made a statement, concerning the plaintiff, to a third party"; the statement could "damage the plaintiff's reputation in the community"; "the defendant was at fault"; and the statement either "caused economic loss" or "is actionable without

proof of economic loss." Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003).

Plaintiff offers no evidence that Walsh made any defamatory statements at all, and DeAmicis obtained the information in her article regarding Plaintiff from executive session minutes from a selectman's meeting. See Exhibit 8, DeAmicis Deposition p. 13, lines 18-21. The executive session minutes from October 24, 2011, reflect that Kreidler updated the Board on Plaintiff's situation in his official capacity as Town Manager. See Exhibit 13, Town of Winchendon Board of Selectman Executive Session Minutes. The minutes state, in relevant part, that Plaintiff "was involved in a consensual relationship with someone much younger… His reported behavior, not wanting this breakup, was not fitting for his position." See Exhibit 13, Town of Winchendon Board of Selectman Executive Session Minutes. Although it is true that the "original utterer of a defamatory statement" can be held liable for "foreseeable republications," see White v. Blue Cross and Blue Shield of Massachusetts, Inc., 809 N.E.2d 1034, 1042 (Mass. 2004), Defendants here are entitled to conditional privilege, even assuming *arguendo* that their statements were defamatory.[1]

Conditional privilege applies to "statements made by public officials while performing their official duties." Mulgrew v. City of Taunton, 574 N.E.2d 389, 392 (Mass. 1991). This conditional privilege provides immunity unless abused, which requires showing that the defendant acted with "actual malice" or that there was "unnecessary, unreasonable, or excessive publication." Catrone v. Thoroughbred Racing Associations of North America, Inc., 929 F.2d 881, 889 (1st Cir. 1991).

---

[1] Courts generally will not reach the issue of whether the statements in question were defamatory at all if the plaintiff has failed to establish abuse of conditional privilege. See e.g., Sovie v. Town of North Andover, 742 F. Supp. 2d 167, 176 (D. Mass. 2010); Landry v. Mier, 921 F. Supp. 880, 887 (D. Mass. 1996).

15

In reporting the status of Plaintiff's employment to the Board of Selectmen, Kreidler was performing his official duty as Town Manager by updating the board on Plaintiff's employment status on the police force. See Mulgrew, 574 N.E.2d at 392 (noting that the purpose of the conditional privilege is to "allow public officials to speak freely on matters of public importance," including the public's interest in "having a police force of competent and able individuals," without the "threat of defamation suits"). Plaintiff bears the burden of showing "by clear and convincing evidence" that Defendant abused the privilege. See Catrone, 929 F.2d at 889.

Here, there was no excessive publication where Kreidler made the statement only once and for a legitimate business reason, to inform the Board of Selectman of the status of a town employee. Nor is there any evidence, never mind clear and convincing evidence, of actual malice, which requires a showing that "the communications were designed to serve some purpose 'beyond[] or . . . outside the purpose of the privilege.'" See Id. at 890 (quoting Boston Mut. Life Ins. Co. v. Varone, 303 F.2d 155, 159 (1st Cir. 1962)). Kreidler's statements at the Board of Selectmen's meeting fell squarely within the purpose of the conditional privilege, "advanc[ing] a legitimate public or private interest common to publisher and recipient," the legitimate interest being the selectman's need to be apprised on the status of town employees. See Id. (citing Sheehan v. Tobin, 93 N.E.2d 524, 528 (Mass. 1950)). Accordingly, Kreidler did not abuse his conditional privilege by making statements about Plaintiff at the selectmen's meeting.

Because Defendants are entitled to conditional privilege on any allegedly defamatory statements made, this Court should enter summary judgment for Defendants on Plaintiff's defamation claim.

**CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that this Court enter summary judgment on Defendants' behalf for all counts.

Respectfully submitted,
Defendants, Town of Winchendon,
Scott Livingston, as Chief of Police,
James Kreidler, as Town Manager, and,
David Walsh, as Chief of Police,

 /s/Jeremy Silverfine
Jeremy Silverfine, BBO No. 542779
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street
Boston, MA 02116
jsilverfine@bhpklaw.com
617-880-7117

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

 /s/Jeremy Silverfine
Jeremy Silverfine, BBO# 542779

Dated: January 20, 2017