UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 4:14-CV-40182 TSH

_____
WILLIAM GEOFFROY,                              )
                                               )
Plaintiff,                                     )
v.                                             )
                                               )
TOWN OF WINCHENDON,                            )
SCOTT LIVINGSTON, as Chief of Police,          )
JAMES KREIDLER, as Town Manager,               )
DAVID WALSH, as Chief of Police,               )
                                               )
Defendants.                                    )
_____)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### UNDISPUTED FACTS

1. William Geoffroy ("Geoffroy") became a police officer in the Town of Winchendon in 1985. See Exhibit 1, Plaintiff's Deposition p. 14, lines 21-22.

2. In October of 2011 Geoffroy was employed as a Sergeant on the Winchendon Police Department. See Exhibit 1, Plaintiff's Deposition p. 164, lines 2-6.

3. Geoffroy was involved in a dating relationship with a female named Catherine Phongsaly ("Phongsaly") for a few weeks between June and July of 2011. See Exhibit 1, Plaintiff's Deposition p. 26, lines 2-24; p. 29, lines 10-20.

4. On the night of October 7, 2011, Geoffroy consumed approximately two and a half beers at the Lucky Dragon restaurant in Winchendon. See Exhibit 1, Plaintiff's Deposition p. 34 lines 19-21; p. 35 lines 10-14.

5.  At approximately 1:30 a.m. on October 8, 2011, Geoffroy drove unannounced to Phongsaly's home to see her. See Exhibit 1, Plaintiff's Deposition p. 31, lines 2-10.

6.  Upon arriving at Phongsaly's residence, Geoffroy observed that a silver Toyota belonging to a male friend of Phongsaly's was parked in her driveway. See Exhibit 1, Plaintiff's Deposition p. 38, lines 1-8.

7.  After returning home at around 2 a.m. on October 8, 2011, Geoffroy phoned Phongsaly and left a voicemail message on her phone. See Exhibit 1, Plaintiff's Deposition p. 33, lines 5-15.

8.  Additionally, Geoffroy sent Phongsaly approximately 28 lengthy text messages. See Exhibit 1, Plaintiff's Deposition p. 36, line 1-24.

9.  The following day, Phongsaly made contact with another Winchendon officer Sergeant Gagne ("Gagne"), who had stopped at the donut shop where she was employed, and relayed the voicemail and the details of the incident to him. See Exhibit 2, Walsh Deposition p. 43-44.

10. Gagne then contacted Lieutenant Walsh and made him aware of the voicemail. See Exhibit 2, Walsh Deposition p. 41, lines 4-16.

11. Lieutenant Walsh proceeded to contact Chief Livingston to make him aware of the information that Gagne had relayed to him. See Exhibit 2, Walsh Deposition p. 41, lines 17-20.

12. At this point, Chief Livingston instructed Lieutenant Walsh to open an investigation into the incident. See Exhibit 2, Walsh Deposition p. 41, lines 21-23; Exhibit 3, Livingston Deposition p. 46, lines 9-18.

13. After hearing the contents of the voicemail message, which consisted of a "two-or three-minute tirade", Chief Livingston was "shocked" and "disgusted." <u>See</u> Exhibit 3, Livingston Deposition p. 43, lines 9-13; p. 44 lines 10-12.

14. The voicemail used profane language, including the word "f***" 26 times. <u>See</u> Exhibit 15, Voicemail Transcript. Geoffroy told Phongsaly in the message that she was "lucky [he] didn't kick [her] f***ing door in." <u>See</u> Exhibit 15, Voicemail Transcript.

15. Phongsaly came to the police station and gave a statement where she stated that she was "concerned" saying, "if he could do this after a few beers, what could he do when he was drunk?" <u>See</u> Exhibit 2, Walsh Deposition p. 46, lines 10-22; p. 49-50.

16. Sergeant Raymond Anair spoke with Phongsaly, who expressed her concern about Geoffroy, and said that he had previously told her "it wasn't hard to keep an eye on [her]… without [her] even knowing." <u>See</u> Exhibit 14, Police Report. Sergeant Anair discussed Phongsaly's option to pursue a 209A restraining order with her. <u>See</u> Exhibit 14, Police Report.

17. Lieutenant Walsh took a statement from Phongsaly in which she stated that Geoffroy was "way too jealous," "would get really mad," "would get all mean," "became obsessive," and told her "he was really good at watching [her]." <u>See</u> Exhibit 16, Statement of Catherine Phongsaly.

18. Phongsaly also stated that Geoffroy "went bananas" when she tried to break up with him, "driving by [her] house at all times of the night," "coming into [her] work frequently," and "run[ning] plates of vehicles parked outside [her]

apartment." <u>See</u> Exhibit 16, Statement of Catherine Phongsaly. Her "friends and coworkers started calling him the 'stalker.'" <u>See</u> Exhibit 16, Statement of Catherine Phongsaly.

19. Phongsaly said that there was no physical abuse in the relationship, but that she had heard Geoffroy had abused girlfriends and his ex-wife in the past. <u>See</u> Exhibit 16, Statement of Catherine Phongsaly.

20. Both Walsh and Kreidler believed that Geoffroy's actions constituted criminal activity, namely stalking and harassment. <u>See</u> Exhibit 2, Walsh Deposition p. 56-59; Exhibit 9, Kreidler Deposition p. 127-28. Walsh also believed that Geoffroy's conduct, including threatening to kick someone's door down, running license plates, following Phongsaly, and other actions, were a violation of department policy as Conduct Unbecoming. <u>See</u> Exhibit 2, Walsh Deposition p. 63, lines 5-24.

21. The Winchendon Police Department practices a "zero tolerance policy" regarding domestic violence, including stalking and threats. <u>See</u> Exhibit 10, "Domestic Violence by Police Officers."

22. An initial meeting was held where Chief Livingston reviewed the tape with Geoffroy and his union representative. <u>See</u> Exhibit 3, Livingston Deposition p. 51, lines 4-7. Geoffroy was given an opportunity to speak and chose not to. <u>See</u> Exhibit 3, Livingston Deposition p. 51, lines 7-8.

23. During this initial meeting the possibility of discipline, which included suspension and demotion, was discussed with Geoffroy. <u>See</u> Exhibit 3, Livingston Deposition p. 51, lines 18-24.

24. Chief Livingston also suspended Geoffroy's firearm license after Geoffroy's union president Martin Rose ("Rose") expressed concern that Geoffroy might try to hurt himself. See Exhibit 3, Livingston Deposition p. 64, lines 1-20; Exhibit 22, Letter re License to Carry and Firearm.

25. On October 19, 2011, during a meeting held at the Town Manager's office, Geoffroy, accompanied by union representatives and union counsel, was offered either termination or resignation and chose to resign. See Exhibit 1, Plaintiff's Deposition p. 47, lines 13-17; p. 49-50.

26. Prior to deciding if he wished to resign, Geoffroy spoke to union president Rose. See Exhibit 1, Plaintiff's Deposition p. 84 lines 11-20. Rose advised Geoffroy that his best option was to resign, but that in the end it was his decision to make. See Exhibit 4, Rose Deposition p. 23, lines 3-12.

27. Geoffroy also spoke to union representative Mike Bombard ("Bombard"). See Exhibit 1, Plaintiff's Deposition p. 85, lines 18-22. Bombard did not force Geoffroy to resign and advised Geoffroy that ultimately the decision was his to make. See Exhibit 5, Bombard Deposition p. 18, lines 19-24. Bombard attempted to convince Geoffroy not to resign, but Geoffroy insisted on doing so. See Exhibit 5, Bombard Deposition p. 19, lines 1-5; p. 36, lines 14-16.

28. Geoffroy further consulted with the union attorney, Michael Clancy ("Clancy"). See Exhibit 1, Plaintiff's Deposition p. 85, lines 23-24; p. 86, lines 1-2. Prior to Geoffroy's resignation, he met with Attorney Clancy, who advised him of his rights and went through the resignation agreement, section by section, before allowing him to make a decision on how to proceed. See Exhibit 6, Clancy

Deposition p. 30, lines 8-16; p. 61, lines 7-22. Attorney Clancy did not force

Geoffroy to resign or encourage him to sign the agreement. <u>See</u> Exhibit 6, Clancy

Deposition p. 28, lines 13-15; p. 56, lines 14-18.

29. Geoffroy made the decision to resign rather than face a termination hearing in

order to save his pension. <u>See</u> Exhibit 1, p. 110-12. Exhibit 17, Livingston's

Answers to Interrogatories, ¶¶ 2, 3, 6, 13; Exhibit 18, Kreidler's Answers to

Interrogatories, ¶¶ 6, 8, 15; Exhibit 19, Town's Answers to Interrogatories, ¶ 2.

Geoffroy acknowledges that he had a choice of whether to resign or be

terminated. <u>See</u> Exhibit 1, Plaintiff's Deposition p. 109, lines 3-7.

30. On October 24, 2011, Geoffroy returned to the Town Manager's office

accompanied by Derek Blair ("Blair"), the vice-president of the union, and signed

a release agreement relative to his resignation. <u>See</u> Exhibit 1, Plaintiff's

Deposition p. 52, lines 14-18. Blair did not force Geoffroy to resign. <u>See</u> Exhibit

7, Blair Deposition p. 20, lines 8-10.

31. Geoffroy signed the agreement of his own free will, allowing him to continue to

receive payroll for approximately six months until his anniversary date and retain

his pension. <u>See</u> Exhibit 17, Livingston's Answers to Interrogatories, ¶ 13;

Exhibit 18, Kreidler's Answers to Interrogatories, ¶ 15; Exhibit 19, Town's

Answers to Interrogatories, ¶ 15.

32. Geoffroy had 21 days to review the agreement and seven days to revoke after

signing. <u>See</u> Exhibit 11, Separation Agreement and General Release

("Agreement"), ¶ 12. Geoffroy was familiar with the disciplinary system of the

department and the town, having been through the disciplinary process before,

negotiated suspensions, including obtaining immunity for himself in one incident, and signed a 2002 release agreement with the town regarding a suspension. <u>See</u> Exhibit 1, Plaintiff's Deposition p. 224, lines 3-11; p. 231, lines 4-24; p. 234, lines 7-17; Exhibit 23, Settlement Agreement and Release; Exhibit 24, Hearing Request letter; Exhibit 25, Order to Respond letter and response. Geoffroy had also been an active union member for 27 years and previously served as secretary in the police union. <u>See</u> Exhibit 1, Plaintiff's Deposition p. 47, 52.

33. Geoffroy also sent a letter of resignation "for the sole purpose of retirement" to Kreidler, which Kreidler accepted. <u>See</u> Exhibit 21, Letter of Resignation and Acceptance.

34. The Agreement Geoffroy signed with the town promises only a neutral reference, not the issuing of a retirement identification. <u>See</u> Exhibit 11, Agreement.

35. In September or October of 2012 Geoffroy requested a police retirement identification and his request was rejected. <u>See</u> Exhibit 1, Plaintiff's Deposition p. 154, lines 14-24. Chief Livingston cites a lack of "good standing" as the reason why Geoffroy was not issued a retirement identification. <u>See</u> Exhibit 3, Livingston Deposition p. 34, lines 2-5.

36. The Massachusetts ID policy put out by the Massachusetts Chiefs of Police Association state that an officer needs to be in good standing at the time of retirement in order to receive a retirement identification. <u>See</u> Exhibit 17, Livingston's Answers to Interrogatories, ¶ 12. It was the opinion of both Livingston and Walsh that Geoffroy was not in good standing at the time he left

the department. <u>See</u> Exhibit 17, Livingston's Answers to Interrogatories, ¶¶ 12,

14; Exhibit 20, Walsh's Answers to Interrogatories, ¶ 16.

37. Geoffroy filed a charge with Massachusetts Commission Against Discrimination

("MCAD") and Equal Employment Opportunity Commission ("EEOC"), alleging

retaliation for not receiving his retirement identification. <u>See</u> Exhibit 12,

MCAD/EEOC Charge ("Charge").

38. Ruth DeAmicis ("DeAmicis"), an editor for *The Winchendon Courier*, wrote a

paragraph for the newspaper stating that "Geoffroy was forced to resign in 2012;

amid a scenario involving a breakup with a girlfriend that seemed to affect his job

performance at that time." <u>See</u> Exhibit 8, DeAmicis Deposition p. 13, lines 8-13;

p. 9, lines 9-14.

39. DeAmicis obtained this information from "executive session minutes from the

selectmen." <u>See</u> Exhibit 8, DeAmicis Deposition p. 13, lines 18-21. DeAmicis

never discussed this article with anyone from the police department or anyone

else from the town, other than the Board of Selectmen. <u>See</u> Exhibit 8, DeAmicis

Deposition p. 15, lines 15-22.

40. The executive session minutes from October 24, 2011, reflect that Kreidler

updated the Board on Geoffroy's situation in his official capacity as Town

Manager. <u>See</u> Exhibit 13, Town of Winchendon Board of Selectman Executive

Session Minutes. The minutes state, in relevant part, that Geoffroy "was involved

in a consensual relationship with someone much younger… His reported

behavior, not wanting this breakup, was not fitting for his position." <u>See</u> Exhibit

13, Town of Winchendon Board of Selectman Executive Session Minutes.

Respectfully submitted,
Defendants, Town of Winchendon,
Scott Livingston,
James Kreidler, and,
David Walsh,

*/s/ Jeremy Silverfine*
Jeremy Silverfine, BBO #542779
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street
Boston, MA 02116
(617) 880-7117
jsilverfine@bhpklaw.com


## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

*/s/Jeremy Silverfine*
Jeremy Silverfine, BBO# 542779


Dated:  January 20, 2017